GOLLEHON FARMING; Gollehon Grain Co.; Greg P. Alzheimer; Jim Anderson; Larry F. Arendt; Armstrong Farms; Bar Triangle J. Ranch; B.M. (Bud) Beastrom; James Beastrom; Cecil Benjamin; Dellas Bentz; Carter Berg, et al.; Dennis and Herman Bertsch; Roger, Myrna & Randy Bertsch; Pius Black; Arlo Bodin; Sidney Boe; Albert L. Boeckel; Gaylon E. Brandt; Gilbert Braun; Ervin Bren; Budak Farms; Bart Burdick; Jerry & Donna Buxbaum; CA Weeding & Sons; Lloyd L. Calkins; Don Canham; Chapin Farm Account; Charles Senner, Inc.; Christine Christiansen; Helen Christiansen; Carlyle H. Colby; et al., Plaintiffs,

v.

UNITED STATES of America, Defendants.

No. CV–96–033–GF–PGH.

United States District Court, D. Montana.

June 12, 1998.

William C. Watt, Sara J. Johnson, Robert G. Mullendore, Mullendore, Tawney, Watt, PC, Missoula, MT, Alan F. Blakley, Blakley & Velk, Missoula, MT, for Plaintiffs.

### MEMORANDUM AND ORDER

HATFIELD, Senior District Judge.

The plaintiffs, consisting of 346 farmers and 2 grain elevator companies located in Montana, North Dakota and South Dakota, instituted the present action seeking monetary and declaratory relief for injuries allegedly incurred between May 2, 1993, and January 24, 1994, when the Federal Grain Inspection Service ("FGIS"),[1] adopted the Near Infrared Transmittance ("NIRT") technology as the official method for estimating the protein content in wheat analyzed under its national wheat testing program. Plaintiffs' claims for monetary damages are premised upon the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671–2680, the Little Tucker Act, 28 U.S.C. § 1346(a)(2), and the Grain Standards Act, 7 U.S.C. §§ 71 *et seq.* The claims for declaratory relief are based upon alleged violations of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.*

Presently before the court is defendant's Motion to Dismiss; plaintiffs' Motion for Summary Judgment; plaintiffs' Motion for Sanctions; and plaintiffs' Motion for Class Certification on behalf of all wheat producers and county grain elevators in the United States that sold wheat between May 2, 1993, and January 24, 1994, under circumstances where the protein content of the wheat was determined by miscalibrated NIRT instruments.[2] Having reviewed the record, together with the briefs submitted by the respective parties, the court is prepared to rule.

---

1. The FGIS is an agency of the United States Department of Agriculture. The FGIS is currently known as the Grain Inspection, Packers and Stockyards Administration ("GIPSA"). For purposes of this Memorandum and Order, both the FGIS and its replacement, the GIPSA, will be referenced collectively as the FGIS.

2. Plaintiffs urge the court to certify a class action with a plaintiff class described as follows:

"(a) All wheat producers in the United States who sold wheat for a price determined wholly or in part with reference to measured or estimated protein content between May 2, 1993, and January 24, 1994 (inclusive).

(b) All independent country grain elevator operators and other persons in the United States who purchased wheat for a price determined wholly or in part with reference to measured or estimated protein content between May 2,

## BACKGROUND

Through the Grain Standards Act of 1976 and related amending acts, 7 U.S.C. §§ 71 *et seq.*, Congress seeks to protect the integrity of interstate and foreign commerce in various agricultural grains. *See,* 7 U.S.C. § 74(a). The Act authorizes the FGIS to evaluate the quality and condition of domestic agricultural grains by means of official inspections at export locations and other official inspection sites. *See,* 7 U.S.C. § 79. Official certificates describe the results of official inspections undertaken by the FGIS. *See,* 7 U.S.C. § 79(a),(c).[3] One of the parameters measured by the FGIS is protein content. *See,* 7 U.S.C. § 79(b), 7 C.F.R. §§ 800.45, 800.71 (Schedule A, Table 1). Protein levels are an *important factor in determining wheat prices,* especially spring wheat, with higher protein levels commanding a higher market price.

Official testing of wheat protein, under the Grain Standards Act, began on May 1, 1978. *See,* 43 Fed.Reg. 13,406 (1978). At that time, the FGIS utilized the Near-infrared reflectance ("NIRR") technology as the official technology to estimate the protein content in wheat. To properly utilize the NIRR technology, wheat grains had to be ground prior to analysis. Inconsistent grinding and handling of the pulverized grain sometimes resulted in inaccurate protein determinations.

Cognizant of the shortcomings of the NIRR technology, the FGIS searched for another method for measuring wheat protein. On July 15, 1992, the FGIS announced it would begin using the NIRT technology to determine the protein content in hard red spring wheat, hard red winter wheat and soft white wheat.[4] Shortly thereafter, the FGIS suspended use of NIRT instruments, when it discovered that calibration equations incorporated into the NIRT instruments failed to accurately estimate the protein content in certain types of hard red winter wheat.

Following further testing and calibration, the FGIS recommenced use of the NIRT instruments on May 2, 1993.[5] At that time, most grain elevators operated by private parties used NIRR instruments to determine wheat protein. Shortly after the FGIS began using NIRT instruments, it became apparent that NIRR instruments used by the grain elevators and NIRT instruments used by the FGIS, did not yield consistent protein estimates for all classes of wheat. Accordingly, the operators of the grain elevators changed the bias of their NIRR instruments so the protein measurements obtained with the NIRR instruments approximated the protein measurements obtained with the official NIRT instruments.[6] Numerous farmers, including the plaintiff-farmers, sold wheat for

1993, and January 24, 1994 (inclusive), and who resold the wheat for a lower price than expected, in circumstances where the lower price was the result of the use of NIRT technology and was not offset by additional gains produced in other transactions from the use of NIRT equipment."
*See,* plaintiffs' Motion for Class Certification.

3. When the FGIS issues an official certificate describing the kind, class, and quality of a grain, the grain may not be described otherwise in a commercial context. *See,* 7 U.S.C. § 78.

4. The principal advantage of the NIRT technology lay in its ability to assay whole grains of wheat.

5. The use of NIRT instruments on May 2, 1993 was proceeded by an official Program Bulletin on March 24, 1993, announcing that the FGIS planned to recommence use of NIRT instruments for estimating wheat protein in all classes of wheat. *See,* Complaint at para. 4.7 Program Bulletin 93.5 stated the FGIS had "extensively tested" the NIRT instruments and "demonstrated that the use of these NIRT instruments will not adversely affect the accuracy of official protein determinations...." *See,* Program Bulletin

93.5, attached to defendant's brief in support of the Motion to Dismiss.

6. The adjustments made to the NIRR instruments by the grain elevators were not mandated by law. The grain elevators voluntarily adjusted the NIRR instruments for their own benefit.

Immediately after the FGIS changed to NIRT instruments, most grain elevators continued to use NIRR instruments to estimate the protein content in wheat purchased from farmers. When the grain elevators subsequently shipped the wheat to export locations in connection with a sale, the wheat was analyzed by the FGIS using NIRT instruments. The NIRT instruments yielded a lower protein measurement than the NIRR instruments. As a consequence, wheat purchased by the grain elevators at a higher price based upon a protein measurement made with NIRR instruments, was sold for a lower price when NIRT instruments used at the export location yielded a lower protein estimate. The grain elevators adjusted the bias of their NIRR instruments so the protein measurements obtained with the NIRR instruments were consistent with the measurements obtained with the NIRT instruments.

a price determined with reference to a protein content measured by the altered NIRR instruments.

Sometime after May 2, 1993, the FGIS learned the NIRT instruments underestimated the protein content in durum wheat harvested in 1993, and certain weathered hard red spring wheat. The underestimation occurred because the NIRT instruments were not properly calibrated for these particular types of wheat. In response, the FGIS developed new calibration equations for hard red spring wheat and durum wheat.[7] The FGIS began using the new calibration equation for durum wheat on November 8, 1993. The FGIS began using the new calibration equation for hard red spring wheat on January 24, 1994. Plaintiffs do not challenge the accuracy of the NIRT instruments following the recalibration in January of 1994. In the present action, the plaintiff-farmers seek, *inter alia,* monetary damages for losses they incurred between May 2, 1993, and January 24, 1994, when they sold wheat for a price determined by grain elevators using NIRR instruments adjusted to approximate the protein measurements of the NIRT instruments used by the FGIS. The plaintiff-farmers allege they incurred losses when the NIRR instruments underestimated the protein content in their wheat. The plaintiff-farmers contend the government is responsible for their losses, because the FGIS used miscalibrated NIRR instruments for official protein determinations, knowing the private grain elevators would adjust their NIRR instruments to approximate the protein measurements of the official NIRT instruments.

The plaintiff-grain elevators allege they incurred damages when they purchased wheat from farmers, based upon a protein content determination made with NIRR instruments that were not adjusted to approximate NIRT instruments, and then sold the same wheat for a lower price when miscalibrated NIRT instruments, operated by the FGIS, yielded a lower protein estimate.

**7.** The new calibration equation for hard red spring wheat was based upon a calibration set which included additional samples of weathered hard spring wheat harvested in 1993. The new calibration equation for durum wheat was based upon a calibration set that included samples of durum wheat harvested in 1993.

## DISCUSSION

## I. DEFENDANT'S MOTION TO DISMISS

### A. FTCA Claims

The FTCA operates as an explicit waiver of the government's sovereign immunity under certain circumstances. The FTCA provides that the United States may be held liable in tort when a federal employee is negligent in the scope of his employment "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." *See,* 28 U.S.C. § 1346(b). The FTCA's waiver of sovereign immunity, however, is not without limits. Section 2680 of Title 28 describes several exceptions to the government's liability under the FTCA. When a claim falls within an exception to the FTCA's waiver of sovereign immunity, the court is without subject matter jurisdiction to hear the case. *Mundy v. United States,* 983 F.2d 950, 952 (9th Cir.1993). Each exception to the FTCA must be strictly construed in favor of the United States. *Saraw Partnership v. United States,* 67 F.3d 567, 569 (5th Cir.1995).

In the case *sub judice,* the government argues the plaintiffs' FTCA claims should be dismissed for three reasons. First, the claims are barred by the "misrepresentation exception" to the FTCA. *See,* 28 U.S.C. § 2680(h). Second, the claims are barred by the "discretionary function exception" to the FTCA. *See,* 28 U.S.C. § 2680(a). Third, the United States, if a private person, could not be found liable under State law for the alleged acts underlying the plaintiffs' FTCA claims. *See,* 28 U.S.C. § 1346(b).

### a. Misrepresentation Exception

The misrepresentation exception to the FTCA prohibits claims against the United States "arising out of ... misrepresentation." [8] *See,* 28 U.S.C. § 2680(h). The

**8.** 28 U.S.C. § 2680(h) provides, in pertinent part, as follows:

"The provisions of this chapter ... and section 1346(b) of this title shall not apply to—

 * * * * * *

exception covers both affirmative acts of misrepresentation and omissions of material fact. *McNeily v. United States,* 6 F.3d 343, 347 (5th Cir.1993). It excludes both negligent and intentional misrepresentation claims. *OPM v. Richmond,* 496 U.S. 414, 430, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990). Historically, courts have had difficulty determining whether a claim is one for misrepresentation. The concept is slippery; "any misrepresentation involves some underlying negligence" and "any negligence action can be characterized as one for misrepresentation because any time a person does something he explicitly or implicitly represents that he will do the thing non-negligently." *United States v. Fowler,* 913 F.2d 1382, 1387 (9th Cir.1990). "[T]he essence of an action for misrepresentation, whether negligent or intentional, is the communication of misinformation on which the recipient relies." *Block v. Neal,* 460 U.S. 289, 296, 103 S.Ct. 1089, 75 L.Ed.2d 67 (1983).

■ To determine whether a claim is one of misrepresentation or negligence, the court examines the distinction "between the performance of operational tasks and the communication of information. The [g]overnment is liable for injuries resulting from negligence in performance of operational tasks even though misrepresentations are collaterally involved. It is not liable, however, for injuries resulting from commercial decisions made in reliance on government misrepresentations." *United States v. Fowler,* 913 F.2d 1382, 1387 (9th Cir.1990). Stated another way, the court must determine whether the chain of causation from the alleged negligence to the alleged injury depends on the transmission of misinformation by the government. *Leaf v. United States,* 661 F.2d 740, 742 (9th Cir.1981); *Sheehan v. United States,* 896 F.2d 1168, 1170–71 (9th Cir.1990), *amended,* 917 F.2d 424 (9th Cir. 1990). If the causal chain is dependent upon the transmission of misinformation, the mis-

representation exception applies and there is no waiver of sovereign immunity under the FTCA. If, on the other hand, the casual chain does not depend on misinformation, the misrepresentation exception does not apply. *Leaf, supra,* 661 F.2d at 742; *Commercial Union Ins. Co. v. United States,* 928 F.2d 176, 179 (5th Cir.1991).

**1.** *FTCA Claims Advanced by the Plaintiff–Farmers*

■ Based upon the facts presented in the case *sub judice,* the court is compelled to conclude that the transmission of misinformation was a necessary link in the causal chain from the alleged negligence on the part of the FGIS, and the injuries allegedly sustained by the plaintiff-farmers. The gravamen of the claims asserted by the plaintiff-farmers is that the FGIS, by adopting the NIRT technology, was, in effect, representing that the NIRT instruments, when calibrated with the calibration equations in existence in May of 1993, accurately measured the protein content in all types of wheat. Because the FGIS was the official authority on protein determination in agricultural grains, private grain elevators adjusted their protein determination instruments to approximate the protein measurements obtained with the FGIS' NIRT instruments. Plaintiffs allegedly incurred damages because the NIRT instruments used by the FGIS from May 3, 1993 through January 24, 1994, were actually miscalibrated, causing the protein content to be underestimated by the NIRR instruments used by the grain elevators. Negligent misrepresentation, therefore, is an essential part of the FTCA claims asserted by the plaintiff-farmers.

The plaintiff-farmers assert their FTCA claims are premised upon the negligent performance of operational tasks by the FGIS, rather than any negligent misrepresentation. Specifically, the plaintiff-farmers contend their damages were caused by (1) the failure of the FGIS to use appropriate wheat samples to develop calibration equations for hard red spring wheat and durum wheat;[9] (2) the

---

(h) Any claim arising out of ... misrepresentation, deceit, or interference with contract rights."

**9.** Plaintiffs contend the FGIS was negligent because it failed to use samples of hard red spring

wheat harvested in 1991 and 1992 in its calibration set for hard red spring wheat, and samples of 1993 durum wheat in its calibration set for durum wheat. *See,* Affidavit of Clifford Watson at para. Nos. 11 and 14.

failure of the FGIS to properly store four wheat samples used to calibrate the NIRT instruments for soft white wheat; (3) the failure of the FGIS to delay implementation of the NIRT instruments until the calibration equation for hard red spring wheat could be adequately tested; [10] (4) the failure of the FGIS to properly train the NIRT operators before implementing the change to NIRT instruments; [11] and (5) the failure of the FGIS to recalibrate the NIRT instruments in a timely manner after it was discovered, in May of 1993, that new calibration equations were needed for durum wheat and hard red spring wheat.[12]

The plaintiff-farmers' argument is not compelling because it fails to recognize their FTCA claims are grounded upon the dissemination of misinformation by the FGIS. The primary thrust of the Complaint is that plaintiffs' wheat was falsely assayed by third parties who "change[d] the bias of their protein determination instruments to approximate the erroneous protein calibration of [the defendant's] NIRT instruments." *See*, Complaint at para. 5.2. If the grain elevators changed the bias of their protein determination instruments as alleged, it is clear they did so in reliance upon the government's alleged misrepresentations (by action and word) that the NIRT instruments accurately measured the protein content in wheat. Despite the plaintiff-farmers' attempt to recast their FTCA claims to avoid the jurisdictional bar of the misrepresentation exception, the claims fail because the plaintiff-farmers would not have incurred any injury but for the reliance of the grain elevators on the government's purported misrepresentations.[13]

## 2. *FTCA Claims Advanced by the Plaintiff–Grain Elevators*

The plaintiff-grain elevators allege they incurred damages when they purchased wheat from farmers, based upon a protein content determination made with NIRR instruments that were not adjusted to approximate NIRT instruments, and then sold the same wheat for a lower price when miscalibrated NIRT instruments, operated by the FGIS, yielded a lower protein estimate. Unlike the FTCA claims asserted by the plaintiff-farmers, the FTCA claims of the plaintiff-grain elevators are not grounded upon a misrepresentation by the government. The theory of causation advanced by the plaintiff-grain elevators is based only on purported acts of operational negligence by the FGIS in implementing the change from NIRR instruments to NIRT instruments. Because the causal chain between the alleged negligence by the FGIS and the alleged injury incurred by the grain elevators is not dependent upon misinformation by the FGIS, the claims are not barred by the misrepresentation exception.

## b. *Discretionary Function Exception*

The discretionary function exception operates as the foremost limitation on a court's jurisdiction under the FTCA. The discretionary function exception "marks the

---

10. Plaintiffs contend FGIS was negligent because it proceeded with implementation of NIRT instruments for all classes of wheat on May 2, 1993, although it knew, in November of 1992, that a new calibration equation for hard red spring wheat could not be developed before May of 1993. *See*, Plaintiffs' Statement of Uncontroverted Facts at para. No. 42.

11. Plaintiffs' challenge to the NIRT training provided by the FGIS is two-pronged in nature. First, plaintiffs contend a training session held in February of 1993 to train NIRT operators was inadequate. *See*, plaintiffs' Statement of Uncontroverted Facts at para. No. 46. Second, plaintiffs contend the handbooks describing the proper operation of the NIRT instruments were not distributed to the NIRT operators in a timely manner. *See*, plaintiffs' Statement of Uncontroverted Facts at para. No. 57.

12. Although plaintiffs' brief in opposition to defendant's Motion to Dismiss denominates a sixth way in which the implementation of NIRT instruments was allegedly negligent—"[s]cientific standards were violated in the implementation process"—a review of the record reveals this claim is merely a restatement of the claims attacking the timing of the switch to NIRT instruments; the selection of wheat samples used to calibrate the NIRT instruments; and the training of NIRT operators.

13. Because the court concludes that the FTCA claims of the plaintiff-farmers are barred by the misrepresentation exception, the court does not find it necessary to address the other jurisdictional and merit challenges advanced by the government in opposition to the claims.

boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private ·individuals." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 808, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984). It withholds jurisdiction over any claim "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." *See*, 28 U.S.C. § 2680(a).

▬▬▬ The purpose of the exception is to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Varig Airlines*, 467 U.S. at 814, 104 S.Ct. 2755. If a discretionary function is involved, the fact a decision was negligently made will not bring the challenged conduct outside the exception. *Ayer v. United States*, 902 F.2d 1038, 1041 (1st Cir.1990). The exception applies to policy decisions made at both the operational and planning levels of a federal agency. *See*, *United States v. Gaubert*, 499 U.S. 315, 332, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991); *Dalehite v. United States*, 346 U.S. 15, 36, 73 S.Ct. 956, 97 L.Ed. 1427 (1953).

▬▬▬ To determine whether a claim is barred by the discretionary function exception, the court must apply the two-part test announced in *Berkovitz v. United States*, 486 U.S. 531, 536, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988). First, a court must determine whether the challenged conduct involves an element of choice or judgment for the acting employee: "[t]he discretionary function exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action·for an employee to follow"

and the employee fails to follow that course of action.[14] *Prescott v. United States*, 959 F.2d 793, 798 (9th Cir.1992), *quoting, Berkovitz*, 486 U.S. at 536, 108 S.Ct. 1954. Second, if the challenged conduct does involve a degree of choice, the court must determine whether the choice involved is of the kind Congress intended to shield. *Berkovitz*, 486 U.S. at 536, 108 S.Ct. 1954. The exception applies to only those decisions grounded in considerations of social, economic or political policy. *Varig Airlines, supra*, 467 U.S. at 814, 104 S.Ct. 2755. Consequently, the primary focus of the second part of the test is on the "nature of the actions taken and on whether they are susceptible to policy analysis." *United States v. Gaubert, supra*, 499 U.S. at 325, 111 S.Ct. 1267. Policy analysis may include the weighing of competing interests or the examination of economic constraints in light of the needs of the public. *See, Estate of Callas v. United States*, 682 F.2d 613, 620 (7th Cir.1982).

1. *Application of the Discretionary Function Exception to the FTCA Claims Advanced by the Plaintiff– Grain Elevators* [15]

▬▬▬ As discussed above, the FTCA claims asserted by the plaintiff-grain elevators challenge (1) the FGIS' decision to implement the NIRT technology on May 2, 1993, before new calibration equations for hard red spring wheat were developed; (2) the FGIS' selection of wheat samples used to develop the calibration equations for estimating protein in hard red spring wheat and durum wheat; (3) the FGIS' decision to implement the NIRT technology on May 2, 1993, before NIRT operators were fully trained on the NIRT instruments; (4) the FGIS' storage of four wheat samples used to create the calibration equation for soft white wheat; and (5) the punctuality of the FGIS

---

**14.** The term discretion means "the discretion of the executive or the administrator to act according to one's judgment of the best course." *Dalehite v. United States, supra*, 346 U.S. at 34, 73 S.Ct. 956. It "includes determinations made by executives or administrators in establishing plans, specifications, or schedules of operations. Where there is room for policy judgment and decision there is discretion." *Id.* at 35–36, 73 S.Ct. 956.

**15.** Because the acts of negligence underlying the FTCA claims of the plaintiff-farmers and the plaintiff-grain elevators are the same, the following discussion concerning the discretionary function exception would also apply to the FTCA claims of the plaintiff-farmers, if their claims were not barred by the misrepresentation exception.

in recalibrating the NIRT instruments. When multiple acts of negligence are alleged, the court must look at each alleged act of negligence and determine whether the discretionary function exception applies.[16] *In re Glacier Bay*, 71 F.3d 1447, 1451 (9th Cir. 1995).

Plaintiffs do not dispute that each of the challenged activities was discretionary, as each activity required an element of choice by the FGIS employees involved, and no federal statute, regulation or policy prescribed a particular course of action for the FGIS to follow with respect to any of the activities. Accordingly, the determination of whether the discretionary function applies to an act under scrutiny turns on whether the particular activity was grounded on considerations of social, economic or political policy.

**(i) Decision to Implement NIRT technology on May 2, 1993, before Calibration Equations were Fully Tested (i.e. Timing of Change to NIRT instruments)**

 Plaintiffs contend the FGIS was negligent in selecting May 2, 1993, as the date to implement the NIRT instruments because it was aware in November of 1992, that a new calibration equation for hard red spring wheat could not be developed prior to May of 1993. Plaintiffs suggest it would have been more prudent to delay the commencement of the NIRT technology until the new calibration equation for hard red spring wheat was available.

A review of the record reveals the FGIS' selection of May 2, 1993, as the date to implement the NIRT technology, was premised upon a desire to minimize any adverse effect of the transition on the grain industry.

The FGIS was cognizant that protein estimates measured by NIRR instruments and NIRT may diverge with respect to certain classes of wheat. Accordingly, the FGIS, based upon recommendations of grain industry representatives, selected May 2, 1993, as the transition date because it coincided with the start of the marketing year for wheat, a time when the volume of wheat to be tested would be low.[17] Because the decision to implement the change from NIRR to NIRT instruments involved considerations of political and economic policy, the decision is protected by the discretionary function exception.

**(ii) Selection of Wheat Samples Used to Calibrate NIRT Instruments**

 Plaintiffs contend the FGIS was negligent in selecting wheat samples to calibrate the NIRT instruments because the calibration set used for hard red spring wheat did not include samples of hard red spring wheat harvested in 1991 and 1992, and the calibration set for durum wheat did not include samples of durum wheat harvested in 1993.

At the outset, the court notes the calibration equation selected for use on hard red spring wheat in May of 1993, was developed by the FGIS prior to October 21, 1991.[18] Samples from the 1991 and 1992 hard red spring wheat crop were not used to develop the calibration equation for hard red spring wheat, because the calibration equation for hard red spring wheat was created before the 1991 and 1992 spring wheat crops were harvested. Similarly, samples of durum wheat were not included in the calibration equation used for durum wheat in May of 1993, because the calibration equation for

---

**16.** Plaintiffs concede, as they must, that the FGIS' decision to change from NIRR instruments to NIRT instruments in May of 1993, was a policy decision protected by the discretionary function exception. *See*, plaintiffs' brief in opposition to defendant's Motion to Dismiss at page 7. The change from NIRR to NIRT instruments was spawned by the FGIS' desire to certify the quality of grain as accurately as possible and thereby facilitate trade in grain. The FGIS was frustrated by its inability to root out the causes of variability in NIRR results and was convinced that NIRT testing would provide greater consistency in test results. *See*, Declaration of David Funk, Chief of the Quality Control and Testing Branch of the FGIS.

**17.** *See*, Page 18 of Report of General Accounting Office: Wheat Pricing; Information on Transition to New Tests for Protein, attached to the defendant's brief in support of the Motion to Dismiss, as Exhibit 3.

**18.** *See*, Memorandum from Richard Pierce, Leader of Type Evaluation Group, to David Funk dated October 21, 1991, attached to Affidavit of Alan F. Blakley.

durum wheat was created before the 1993 durum wheat crop was harvested.

■ In view of these facts, it is clear plaintiffs' challenge to the selection of wheat samples is, in reality, an attack on the timing of the switch from NIRR to NIRT instruments. The decision to proceed with implementation of the NIRT instruments on May 2, 1993, when wheat volumes were low, rather than delay implementation until more updated calibration equations could be developed for hard red spring wheat and durum wheat, involved policy considerations. While it is true the FGIS could have hired more staff or otherwise mobilized more resources to facilitate the development of new calibration equations before May 2, 1993, that decision requires the consideration of fiscal policy. Decisions as to the best allocation or use of limited governmental resources are precisely the type of governmental decisions the discretionary function was designed to immunize from suit. *Fang v. United States,* 140 F.3d 1238 (9th Cir.1998). Accordingly, it is the opinion of this court that the FGIS' selection of wheat samples used to develop the calibration equations for durum wheat and hard red spring wheat, is protected by the discretionary function exception.

### (iii) *Training of NIRT Operators*

■ Plaintiffs' challenge to the training provided the NIRT operators is premised upon (1) a February 12, 1993, memorandum from the leader of the Wheat Protein Group, Mary Ann Wickman, to her supervisor, David Funk, wherein Wickman is critical of a NIRT training session she conducted;[19] and (2) the failure of the FGIS to distribute NIRT operation handbooks to NIRT operators until the day before implementation of the NIRT instruments. *See,* Plaintiffs' Statement of Uncontroverted Facts Nos. 46 and 57.

The alleged deficiencies in the training seminar for NIRT operators, and the delay in distributing operation handbooks, were the indirect result of the FGIS' decision, on or about October of 1992, to implement the change to NIRT instruments on an expedited schedule. The FGIS determined it was more important to meet the May 2, 1993, implementation deadline than delay implementation until policies concerning the operation of the instruments could be finalized. Moreover, the decision to group operators with mixed NIRT experience into a single training session was undoubtedly made with a view toward expedient and cost effective training of NIRT operators. A challenge to these aspects of NIRT training necessarily requires a court to consider political and economic policies of a governmental agency. Decisions regarding the training of employees are often protected by the discretionary function exception. *See, e.g., Fang v. United States, supra,* 140 F.3d 1238 (decision of National Park Service with respect to level of training provided emergency medical technicians was protected by the discretionary function exception); *Ayer v. United States,* 902 F.2d 1038, 1044 (1st Cir.1990) (training of personnel in the use of missile launch facilities was protected by discretionary function because it involved social and political policy); *Bergquist v. United States Nat. Weather Service,* 849 F.Supp. 1221, 1230 (N.D.Ill.1994)(National Weather Service's decisions regarding training on tornado forecasting were covered by the discretionary function exception).

Wickman's complaint that she was required to leave a training seminar for 90 minutes to attend a meeting involves a challenge to the allocation of agency resources. Whether Wickman's time was better spent with the trainees or in a meeting is not a decision for this court to review. Instead, it is the prerogative of the agency to decide how to best accomplish its mission. Because the training of NIRT operators was influenced by economic and political considerations, the court concludes it is protected by the discretionary function exception.

**19.** Wickman led a NIRT training seminar on February 2–4, 1993, attended by NIRT operators. In the memorandum sent to Funk, Wickman complained (1) that she had insufficient time to prepare instruction materials, (2) that policies concerning the NIRT instruments had not been finalized by the FGIS at the time of the training seminar, (3) that trainees attending the seminar had a variety of experience with NIRT instruments, and (4) that she was required to leave the training seminar for 90 minutes to attend a meeting. *See,* plaintiffs' Statement of Uncontroverted Facts at para. No. 46.

(iv) *Storage of Wheat Samples used to Calibrate NIRT Instruments for Soft White Wheat, and Timeliness of Recalibration Following Implementation on May 2, 1993.*

■ Plaintiffs contend the FGIS was negligent because it (1) failed to properly store four wheat samples used to calibrate the NIRT instruments for soft white wheat; and (2) failed to recalibrate the NIRT instruments in a timely manner after it was discovered, in May of 1993, that new calibration equations were needed for durum wheat and hard red spring wheat.

Plaintiffs' challenge to the storage of certain wheat samples is premised upon a memorandum Wickman wrote to all protein testing field office managers, dated May 19, 1993, wherein she states that four reference samples used to calibrate the NIRT instruments for soft white wheat may have changed during storage and, as a result, the new baseline values for soft white wheat set forth in the memorandum should be used in lieu of the prior baseline values.[20] *See*, plaintiffs' Uncontroverted Facts at para. No. 60.

Plaintiffs' challenge to the recalibration of the NIRT instruments has two parts. First, plaintiffs contend the FGIS was negligent because, despite its knowledge in May, 1993, that the calibration equation for durum wheat did not accurately estimate the protein content in durum wheat harvested in 1993, it failed to investigate the problem until October 21, 1993, and failed to develop a new calibration equation until November 8, 1993. *See*, plaintiffs' Statement of Uncontroverted Facts at para. Nos. 62, 64 and 73. Second, plaintiffs contend the FGIS was negligent because it knew, on May 21, 1993, that a new calibration equation for hard red spring wheat was needed, yet failed to develop a new calibration equation until January 24, 1994. *See*, plaintiffs' Complaint at para. Nos. 4.11–4.12.

The government has not argued the discretionary function exception bars the plaintiffs' claims of improper storage and untimely calibration. Accordingly, in accordance with the prescriptions of Local Rule 220–1(i), the court shall consider the absence of an argument as an admission that, in the opinion of counsel, the discretionary function does not operate to bar the claims.[21]

**B. Claims Based on the Grain Standards Act and the Little Tucker Act**

■ Plaintiffs invoke the court's jurisdiction under the Little Tucker Act, 28 U.S.C. § 1346(a)(2), to assert claims against the government for damages based upon the FGIS' purported violations of the Grain Standards Act, 7 U.S.C. §§ 71–87. Plaintiffs contend they are entitled to monetary relief under the Grain Standards Act, because the FGIS failed to certify the quality of the grain as accurately as practicable, in violation of 7 U.S.C. § 74(b)(2),[22] and failed to assure the accuracy and integrity of the equipment used to grade and inspect the grain in violation of 7 U.S.C. § 79b(a).[23][24]

---

**20.** Plaintiffs fail to explain how the FGIS was negligent in storing the four wheat samples, and fail to describe the injuries they incurred as a consequence of the alleged improper storage.

**21.** The government also argues the plaintiffs' FTCA claims should be dismissed on the ground the United States, if a private person, could not be found liable under state law for the alleged acts underlying the FTCA claims. *See*, 28 U.S.C. § 1346(c). A review of the government's briefs reveal this challenge is directed at those FTCA claims advanced by the plaintiff-farmers. Accordingly, the court will not attempt to address the merits of the argument with respect to the FTCA claims advanced by the plaintiff-grain elevators.

**22.** Section 74(b)(2) of Title 7 provides as follows:

(b) It is also declared to be the policy of Congress—

(2) that the primary objective of the official United States standards for grain is to certify the quality of grain as accurately as practicable;

**23.** Section 79b(a) of Title 7 provides, in pertinent part, as follows:

(a) **Random and periodic testing at least annually; fees.**

The Administrator shall provide for the testing of all equipment used in the sampling, grading, inspection, and weighing for the purpose of official inspection, official weighing, or supervision of weighing of grain located at all grain elevators, warehouses, or other storage or handling facilities at which official inspection or weighing services are provided under this Act, to be made on a random and periodic basis, but at least annually and under such regulations as the Administrator may prescribe, as he deems necessary to assure the accuracy and integrity of such equipment.

**24.** As a preliminary matter, the court notes the

■ The Little Tucker Act provides that district courts shall have original jurisdiction, concurrent with the United States Claims Court, over any "civil action or claim against the United States, not exceeding $10,000 in amount, founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort ..." *See*, 28 U.S.C. § 1346(a). Although § 1346(a)(2) waives the sovereign immunity of the United States, it "does not create any substantive right enforceable against the United States for money damages." *United States v. Mitchell*, 463 U.S. 206, 216, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983). Consequently, a plaintiff must find the substantive right that forms the basis of his claim under the Constitution, an Act of Congress, or a federal regulation. *Mitchell, supra,* 463 U.S. at 216, 103 S.Ct. 2961. Additionally, a plaintiff must demonstrate the source of the substantive law can be fairly interpreted as mandating compensation by the government for the damage sustained. *Id.* at 217, 103 S.Ct. 2961. In the present case, the dispositive issue is whether the Grain Standards Act grants the plaintiffs, expressly or by implication, a right to be paid a sum certain for the damages they allegedly incurred.

plaintiffs do not allege the appropriate jurisdictional amount for their Little Tucker Act claims. A claim under the Little Tucker Act is cognizable in the district courts only if the amount of the claim is less than $10,000. *See*, 28 U.S.C. § 1346(a)(2). Any claim against the United States for monetary relief in excess of $10,000 falls within the exclusive jurisdiction of the United States Claims Court. *See, United States v. Hohri*, 482 U.S. 64, 72, 107 S.Ct. 2246, 96 L.Ed.2d 51 (1987). Plaintiffs do not allege either the appropriate jurisdictional amount or waive any award over the jurisdictional amount. However, because defective allegations of jurisdiction may be solved through an amended Complaint, the court will proceed, for purposes of this Memorandum and Order, to consider whether plaintiffs have stated a substantive basis for the invocation of jurisdiction under the Little Tucker Act.

25. Section 74(a) of Title 7 provides as follows:

**Congressional findings and declaration of policy**
**(a)** Grain is an essential source of the world's total supply of human food and animal feed

■ The Grain Standards Act does not contain a provision expressly authorizing the payment of damages for a violation of the Act. Accordingly, in order for a violation of the Grain Standards Act to operate as a basis for Tucker Act jurisdiction, an entitlement to monetary damages must be implied from the language and policy of the Act. Plaintiffs contend an entitlement to damages can be implied from the language of 7 U.S.C. § 74(a),[25] and the pronouncements of the United States Supreme Court in *United States v. Mitchell, supra,* and the Federal Circuit Court of Appeals in *Doe v. United States*, 100 F.3d 1576 (Fed.Cir.1996).

Plaintiffs have failed to present a persuasive argument, supported by recognized authority, establishing the Grain Standards Act operates to mandate compensation for a violation of the Act. Accordingly, the court is compelled to conclude the Grain Standards Act does not support the invocation of subject matter jurisdiction under the Little Tucker Act.

### C. Claims For Declaratory Relief Under the APA

Plaintiffs invoke the court's jurisdiction under the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*, to advance a claim for declaratory relief. Specifically, plaintiffs

and is merchandised in interstate and foreign commerce. It is declared to be the policy of the Congress, for the promotion and protection of such commerce in the interests of producers, merchandisers, warehousemen, processors, and consumers of grain, and the general welfare of the people of the United States, to provide for the establishment of official United States standards for grain, to promote the uniform application thereof by official inspection personnel, to provide for an official inspection system for grain, and to regulate the weighing and the certification of the weight of grain shipped in interstate or foreign commerce in the manner hereinafter provided; with the objectives that grain be marketed in an orderly and timely manner and that trading in grain may be facilitated. It is hereby found that all grain and other articles and transactions in grain regulated under this Act are either in interstate or foreign commerce or substantially affect such commerce and that regulation thereof as provided in this Act is necessary to prevent or eliminate burdens on such commerce and to regulate effectively such commerce.

urge the court to declare, as void, the FGIS' use of NIRT technology from May 2, 1993, to January 24, 1994, based upon the FGIS' purported violation of the APA and the Grain Standards Act. Plaintiffs assert the FGIS adopted the NIRT technology as the official method for estimating wheat protein, without providing the public with adequate "notice and comment" as required under the APA. *See,* Complaint at para. 13.8. In response, the government argues the claim should be dismissed for lack of jurisdiction because plaintiffs lack the requisite standing. The court agrees.

The requirement of standing, which is grounded in Article III of the United States Constitution, restricts federal court adjudication to actual cases or controversies. *See, Allen v. Wright,* 468 U.S. 737, 750, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). To satisfy the standing requirement of Article III, plaintiffs must demonstrate the following:

> (1) the plaintiff[s] must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly ... trace[able] to the challenged action of the defendant, and not ... the result [of] the independent action of some third party not before the court; and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).[26]

 In the present case, plaintiffs lack standing because the inaccurate calibration equations upon which their claims are premised, are no longer utilized by the FGIS to determine the protein content in wheat. The challenged calibrations were replaced in January of 1994, and plaintiffs do not question

the accuracy of the calibration equations currently used by the FGIS. In short, a favorable declaration concerning the calibration equations in use between May 2, 1993, and January 24, 1994, would not redress any injury alleged by the plaintiffs.

## II. PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs seek summary judgment on three distinct matters. First, plaintiffs seek a declaration that the FGIS' adoption of the NIRT technology in May of 1993, is void, because the FGIS violated the notice and comment requirements prescribed in the APA. Second, plaintiffs seek a determination that the Grain Standards Act is a compensation mandating statute. Third, plaintiffs seek a determination that the FGIS was negligent in implementing the allegedly miscalibrated NIRT technology utilized between May 2, 1993, and January 24, 1994.

 In view of the court's previous rulings on the government's Motion to Dismiss, the first two prongs of plaintiffs' motion may be summarily dismissed as moot. With respect to the claim of the plaintiff-grain elevators that the FGIS acted negligently in implementing the NIRT technology in May of 1993, the court is compelled to conclude summary judgment is inappropriate, given the existence of material factual issues.

## III. PLAINTIFFS' MOTION FOR CLASS CERTIFICATION OF FTCA CLAIMS

Plaintiffs urge the court to certify this matter as a class action on behalf of wheat producers and county grain elevators in the United States that sold wheat between May 2, 1993, and January 24, 1994, under circumstances where the protein content of the wheat was determined by reference to miscalibrated NIRT instruments.[27]

To prosecute a suit as a class action, the following three requirements must be met.

---

**26.** The party invoking federal jurisdiction bears the burden of establishing each of the three elements necessary for standing. *Lujan, supra,* 504 U.S. at 561, 112 S.Ct. 2130.

**27.** *Because the court has deemed it appropriate to dismiss all of the FTCA claims advanced by* the plaintiff-farmers, and dismiss all of the claims of the plaintiff-grain elevators premised upon the Grain Standards Act and the Administrative Procedure Act, the court will focus on the propriety of certifying as a class action the FTCA claims of the plaintiff-grain elevators.

First, it must be established that the court has jurisdiction over the claims upon which the class action is premised. Second, the four prerequisites prescribed in Rule 23(a) of the Federal Rules of Procedure must be satisfied.[28] Third, the suit must satisfy the standards for at least one of the three types of class actions enumerated in part (b) of Rule 23.[29]

The United States argues that the requested class certification is inappropriate because (1) the court lacks jurisdiction to adjudicate the FTCA claims asserted on behalf of the unnamed class members; and (2) the class action fails to satisfy the prerequisites prescribed in Rule 23(a).

A federal court's jurisdiction to determine tort actions against the United States for money damages is limited by § 2675(a) of the Federal Tort Claims Act.[30] *See*, 28 U.S.C. § 2675(a). Section 2675(a) requires, as a prerequisite to filing suit against the United States, that a plaintiff first present an administrative claim to the appropriate federal agency. After the agency has denied the claim or after six months has elapsed, which-ever occurs first, the plaintiff may institute an action in federal court. *See, Avery v. United States*, 680 F.2d 608, 610 (9th Cir. 1982).

 The jurisdictional requirement that the claimant first present his claim to the appropriate federal agency, is essentially one of notice and is satisfied only if the claimant complies with the following three requirements:

(1) the administrative claim must be filed in the name of the claimant and signed by either the claimant or the claimant's legal representative;

(2) the claim must describe the alleged injury sufficiently to enable the agency to begin its own investigation; and

(3) the claim must contain a sum certain statement of the damages sought.

*Cadwalder v. United States*, 45 F.3d 297, 301 (9th Cir.1995).

 The Federal Tort Claims Act makes no distinction between the individual claimant and the claimant who may, by reason of the facts giving rise to his claim, be a mem-

---

**28.** Rule 23(a) provides as follows:

**Rule 23. Class Actions**

**(a) Prerequisites to a Class Action.** One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

**29.** Rule 23(b) provides, in pertinent part, as follows:

**(b) Class Actions Maintainable.** An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

(1) the prosecution of separate actions by or against individual members of the class would create a risk of

(A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or

(B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. . . .

**30.** Section 2675(a) of the FTCA provides, in pertinent part, as follows:

**§ 2675. Disposition by federal agency as prerequisite; evidence**

(a) An action shall not be instituted upon a claim against the United States for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail. The failure of an agency to make final disposition of a claim within six months after it is filed shall, at the option of the claimant any time thereafter, be deemed a final denial of the claim for purposes of this section . . . ."

ber of a class. In both instances, the purpose and language of the FTCA require claimants to have separately and individually satisfied all jurisdictional requirements. *See, e.g., Commonwealth of Pennsylvania v. National Ass'n of Flood Insurers,* 520 F.2d 11, 23–25 (3rd Cir.1975); *In Re Agent Orange Product Liability Litigation,* 818 F.2d 194, 198 (2nd Cir.1987); *Lunsford v. United States,* 570 F.2d 221, 224–26 (8th Cir.1977). Once the jurisdictional requirements are satisfied, the provisions of Rule 23 of the Federal Rules of Civil Procedure become operative with respect to the liability action against the United States in the same manner, and to the same extent, as an action against a private individual. *Commonwealth, supra,* 520 F.2d at 24.

■ In the present case, each of the named plaintiffs filed separate administrative claims with the United States Department of Agriculture ("USDA"). The claims stated they were filed on behalf of the individual named, and on behalf of all others similarly situated, as a class action. The persons and entities comprising the unnamed class members did not submit their own administrative claims to the USDA. Because the jurisdictional requirements of the FTCA require each claimant to submit an individual claim, the court is compelled to conclude the named plaintiffs are barred from prosecuting a class action for damages under the Federal Tort Claims Act.

## IV. PLAINTIFFS' MOTION FOR SANCTIONS

■ Plaintiffs urge the court to impose sanctions against the government, pursuant to Fed.R.Civ.P. 37, as a consequence of the government's failure to respond to Interrogatories Nos. 1 and 2 in plaintiffs' Second Discovery Requests. Interrogatory No. 1 requests the government to identify, *inter alia,* the name, address and principal place of business of all persons or entities who entered into a Uniform Grain Storage Agreement, as a contractor or warehouseman, on a form identified as CCC–25(04–01–92), for the purpose of storing grain with the government. Similarly, Interrogatory No. 2 requests the government to provide the same information with respect to a Uniform Grain Storage Agreement identified as CCC–25(06–01–95). If provided the requested information, plaintiffs will contact the warehouseman and contractors for the purpose of obtaining records they possess, which indicate whether wheat sold by potential class members was analyzed by NIRT instruments.

The government argues the plaintiffs' motion should be denied for three reasons. First, the court's Order dated February 3, 1998, which suspended all further discovery pending resolution of the government's Motion to Dismiss, relieved the government of its obligation to submit a timely discovery response.[31] Second, the requested information may be appropriately discovered only if this matter is certified as a class action, and class certification is inappropriate.[32] Third, the plaintiffs failed to make a good faith effort to secure the requested information from the government without court action as required under Fed.R.Civ.P. 37(a)(2)(B).[33]

Having reviewed the record together with the arguments presented by the parties in support of their respective positions, the court deems it appropriate to deny the Motion for Sanctions. Plaintiffs' arguments to the contrary are not persuasive.

## CONCLUSION

Therefore, for the reasons set forth herein,

---

**31.** Plaintiffs' Second Discovery Requests were served upon the government, via mail, on December 15, 1997. The parties agree that the time for responding to the discovery requests expired on January 20, 1998. Plaintiffs contend the court's Order of February 3, 1998, staying further discovery in this matter, did not abrogate the government's responsibility to respond to the discovery responses at issue, because the discovery responses were due before the Order was entered.

**32.** Plaintiffs concede that the information they seek in Interrogatories Nos. 1 and 2 is irrelevant if the court rejects their request for class certification. *See,* plaintiffs' brief in support of the Motion for Sanctions at pg. 3.

**33.** Rule 37(a)(2)(B) provides that a motion for sanctions, submitted pursuant to Rule 37(a),

"must include a certification that the movant has in good faith conferred or attempted to confer with the person or party failing to make the discovery in an effort to secure the information or material without court action."

IT IS HEREBY ORDERED that defendant's Motion to Dismiss is GRANTED to the extent described above. As a result of the court's ruling, all of the claims of the plaintiff-farmers are DISMISSED in their entirety. The claims of the plaintiff-grain elevators, which are premised upon the Grain Standards Act, the Little Tucker Act and the Administrative Procedure Act, are also DISMISSED in their entirety. All of the FTCA claims advanced by the plaintiff-grain elevators are DISMISSED with exception of the claims premised upon the FGIS' alleged failure to properly store samples of soft white wheat, and the FGIS' failure to recalibrate the NIRT instruments in a timely manner after implementation began on May 2, 1993.

IT IS FURTHER ORDERED that plaintiffs' Motion for Summary Judgment is DENIED, plaintiffs' Motion for Class Certification is DENIED, and plaintiffs' Motion for Sanctions is DENIED.

The Clerk of Court is directed to notify counsel for the respective parties of the entry of this order.